**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

VERIZON WIRELESS (VAW) LLC,

        Plaintiff,

v.                                Case No: 07-2255-DJW

DOUGLAS COUNTY, KANSAS
BOARD OF COUNTY COMMISSIONERS,

        Defendant.

## MEMORANDUM AND ORDER

This is an action for declaratory, injunctive, and mandamus relief pursuant to the Federal Telecommunications Act of 1996 (the "TCA").[1]  More specifically, Plaintiff Verizon Wireless ("Verizon") alleges that the decision of Defendant Douglas County Board of County Commissioners ("Defendant" or "Board of Commissioners") to deny Verizon's application for a conditional use permit to construct a wireless telecommunications facility violates the TCA in that (1) Defendant's denial fails to meet the "in writing" requirement of the TCA; and (2) Defendants failed to base its denial upon substantial evidence, as required by the TCA.  The parties have filed cross-motions for summary judgment addressing both of these issues.  For the reasons stated below, the Court will grant Verizon's Motion for Summary Judgment in part, find Verizon's Motion for Summary Judgment moot in part and deny Defendant's Motion for Summary Judgment.

## Procedural History

With regard to Verizon's allegations pertaining to Defendant's failure to comply with the "in writing" requirement of the TCA, this Court issued a Memorandum and Order on February 1, 2008  finding that the June 28 letter submitted by Defendant and summarizing the reasons why

---

[1] 47 U.S.C. § 332 (1996).

Commissioner Jones did not vote to approve the conditional use permit was insufficient to satisfy the "in writing" requirements of the TCA.  In support of this finding, the Court noted the June 28 letter was drafted and sent to Defendant's counsel by a member of the Douglas County Planning Staff and not by a member of the Douglas County Board of Commissioners, the Defendant in this action.

Instead of summarily granting judgment in favor of Verizon on this issue, however, the Court ordered Defendant to submit a (1) a written decision separate from the written record (2) describing the reasons for denying Verizon's application with (3) sufficient explanation to allow a reviewing court to evaluate whether there is evidence in the record to support the stated reasons.  Defendant has submitted the written decision as directed and the Court is now ready to rule on the merits of the sole remaining legal issue: whether Defendant's denial of Verizon's application for a conditional use permit to construct a wireless telecommunications facility violates the TCA in that Defendant failed to base its denial upon substantial evidence, as required by the TCA.[2]

## Summary Judgment Standard[3]

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."[4]  In applying

---

[2]Because Defendant has submitted the written decision as directed, the Court will find Verizon's motion for summary judgment moot as to that part of the motion that pertains to Defendant's failure to comply with the TCA's "in writing" requirement.

[3]Verizon and Defendant both have filed motions for summary judgment. The Court will address the motions together. The legal standard does not change if the parties file cross-motions for summary judgment. Each party has the burden of establishing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law. *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

[4]Fed. R. Civ. P. 56(c).

this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[5]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[6]  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[7]

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[8]  In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[9]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[10]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[11]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier

---

[5]*Spaulding v. United Transp. Union,* 279 F.3d 901, 904 (10th Cir. 2002).

[6]*Wright ex rel. Trust Co. v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[7]*Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[8]*Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[9]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671).

[10]*Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986)); *see also Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324.

[11]*Anderson*, 477 U.S. at 256; *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

of fact could find for the nonmovant."[12]  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[13] Finally, the court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"[14]

### Uncontroverted Facts

**A.     The Parties**

1.     Verizon is in the telecommunications business and provides commercial mobile radio service in Douglas County, Kansas pursuant to an 850 megahertz "cellular license" and a 1900 megahertz "PCS license" issued by the Federal Communications Commission (the "FCC").

2.     Defendant exercises the powers that Douglas County, Kansas has as a body corporate and politic, including the power to sue and be sued.

**B.      Verizon's Application for a Conditional Use Permit**

3.     On or about February 21, 2007, Selective Site Consultants, Inc. ("SSC"), on behalf of Verizon, submitted an application for a conditional use permit, which Defendant designated CUP-03-05-07, for approval to construct a wireless telecommunications facility, including a 150-foot tall monopole tower, antenna, single standard-mount platform, and related ground-based telecommunication equipment (collectively, the "Proposed Tower") on a 100-foot by 100-foot parcel

---

[12]*Mitchell v. City of Moore,* 218 F.3d 1190, 1197-98 (10th Cir. 2000) (citation omitted).

[13]*Adams*, 233 F.3d at 1246.

[14]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

of land leased by Verizon from the owner of 261 East 1250 Road, Baldwin City, Kansas, 66006 (the "Masur Property").

    4.    Verizon's application consisted of the following:

    a.    Project Description Letter;

    b.    Application form for conditional use permit;

    c.    "Consent to Act on Behalf of the Owners of Property" by Judy Masur;

    d.    Vicinity Street Map;

    e.    Topographical Map;

    f.    Assessment and Property Tax Information for the Masur Property;

    g.    Verification of Ownership of the Masur Property;

    h.    Zoning District Map;

    i.    FEMA Flood Hazard Map;

    j.    Affidavit of Darren Hunter, Site Acquisition Contractor for Verizon, Regarding Co-Location Opportunities;

    k.    Affidavit of Marion Crable, Manager of Network Real Estate for Verizon, Regarding Compliance with FCC, FAA, and Other Government Regulations;

    l.    Affidavit of Marion Crable, Manager of Network Real Estate for Verizon, Regarding Compliance with Douglas County Zoning Ordinance, Article 19, Section 19-4(31);

    m.    Minutes of the December 6, 2006 Meeting of the Lawrence-Douglas County Board of Commissioners Regarding CUP-08-06-06, Verizon's previous application submitted on or about August 6, 2006, for a conditional use permit to construct a 150-foot monopole tower and related equipment to be located at 1271 N. 222 Road, a commercial green house property;

    n.    Tower Manufacturer's Report on the Design and Reliability of Tapered Monopole Towers;

    o.    Photo Simulations and Photographs;

p.      Verizon's Radio Frequency Engineer's Site Justification Report;

q.      Propagation Studies;

r.      Map of Existing Towers Within Douglas County;

s.      Site Plans;

t.      Excerpt from FCC Regarding System Auction and Development;

u.      "Wireless Association Quick Facts Relating to Consumer Usage";

v.      "Executive summary of the Impact Study of the US Wireless Telecommunication Industry on the US Economy";

w.      "Property Value Concerns"; and

x.      Recent Article Relating to 'Wireline Cord Cutters'.

5.      Verizon also supplied the following studies and appraisals regarding the impact of telecommunications towers on property values to support CUP-03-05-07:

a.      Impact Study of Commercial Telecommunication Towers and Monopoles on Surrounding Residential Property Values relating to the Kansas City Metropolitan Area;

b.      Communication Tower Impact Study relating to Rocheport, Missouri;

c.      Presentation to the Village of Glenview Zoning Board of Appeals providing analysis and conclusions relating to affect of telecommunications tower on property values in Glenview, Illinois; and

d.      Property Value Impact Study of Proposed PCS Monopole for Cellular Communications Antennae at the City of Lawrence, Kansas Water Treatment Plant to determine impact of cellular telephone monopoles on surrounding residential property values.

6.      The Project Description Letter contained, in part, the following description of the project:

Verizon has both an 850 megahertz (MHz) "cellular license" and a 1900 MHz "PCS license" in Douglas County, and operates separate wireless networks under each of these licenses

throughout the county. Verizon also has a 1900 MHz license in neighboring Franklin County to the south, but it does not have an 850[M]Hz license in Franklin County. The proposed project . . . is intended to fill in a significant gap in coverage that exists in both its 850 MHz and 1900 MHz license areas in southern Douglas County. Since Verizon does not have license to allow it to send its 850 MHz signal into Franklin County to the south, the proposed new tower site must be geographically situated such that it can fill in its 850 MHz coverage gap south to the Douglas County line, but not so close that its 850 MHz signal would encroach into Franklin County. The Project location was based on these unique siting parameters . . . .

7.    The Project Description Letter also contained, in part, the following technical

information:

All of the technologies involved are governed by line of sight limitations and wireless phones generally need to "see" a compatible wireless communications facility for operation of customer phones, transmission, and reception. Because of this limitation, a Base Transceiver Station (BTS), consisting of the antenna, antenna support structure, and groundbased telecommunication equipment, is located near the center of each cell. Basically, the BTS is a network component that provides the connection between a user's mobile handset and either another mobile handset or the "standard" wired network system.

*                    *                    *                    *

Radio Frequency (RF) Engineers use prediction tools to generate propagation studies to determine how effectively a proposed cell site will provide the required coverage. For [this] Application, RF Engineers . . . generated a comprehensive Propagation Study with maps that depict its present collocation on an existing tower to the north of the Project and a proposed collocation on an existing tower to the west. The propagation maps further show the current lack of coverage in this area of the County and how the coverage will be improved with the implementation of this site.

*                    *                    *                    *

When new tower sites are required, a location is chosen after a "Search Ring" is developed and issued by Verizon's RF Engineers. The Search Ring indicates a geographic area in which potential sites may be located which will result in the maximum amount of coverage in an impaired service area. These search rings are issued to site acquisition personnel who are assigned the task of locating property owners reception to a tower being located on their property. Site Acquisition Contractors are instructed by Verizon's management to initially target existing sites (rooftops, towers, and any existing structures) within the Search Ring, upon which to collocate equipment.

8.    The Project Description Letter provided, in part, the following specific site

information:

7

In the instant case, Verizon RF Engineers issued a "Search Ring" whose epicenter is located 2.13 miles south of the intersection of Highways 56 and 59 in Douglas County. The RF Engineers also determined that the radius of this search ring is one mile. The overall purpose of the proposed site is to improve coverage between the City of Overbrook along highway 56 to the City of Baldwin and from the City of Baldwin down Highway 59 to the City of Ottawa.

*       *       *       *

[SSC] first viewed the area within the one mile radius and found that approximately the west one-half of the search ring was in the flood plain which negates that area from consideration. Also excluded from the site selection was a private landing strip, and surrounding area, which exists on the west side of the search ring. SSC then drove the entire remainder of the search ring area to determine whether any collocation opportunities existed. There were no structures found of a sufficient height and/or strength available to meet the RF Engineer's requirements.

It should be noted that the majority of the search ring area is zoned Agricultural and there are existing residential homes scattered through the area. At the request of Planning Staff, SSC contacted the owners of the commercial establishments at the intersection of 56/59 highways, . . . None of these property owners were willing to lease land to Verizon.

The only other "commercial" use in the area is a green house/nursery located on 222nd Road owned by named Ronald E. and Margaret E. Shouse. SSC contacted the Shouses and agreed to lease a portion of their property on behalf of Verizon. This site was the subject of the earlier application . . ., to which several property owners objected.

9.     Verizon's Radio Frequency Engineer's Report also explained that Verizon operates on a cellular license in Douglas County and a PCS license in Franklin County and that the proposed site will operate on both cellular and PCS bands, which will allow Verizon "to transition our customers from Cellular to PCS as the[y] drive from Douglas County to Franklin County and vice versa as they come from Franklin County to Douglas County" and to provide improved coverage along Highways 56 and 59.

10.     The Radio Frequency Engineer's Report also explained that, on the propagation maps, the signal levels shown on the maps are: red, which represents in-building coverage; yellow, which represents in-vehicle coverage; and green, which represents external coverage.

**C.     Zoning Regulations for the Unincorporated Territory of Douglas County, Kansas**

11.     Article 19 of the Zoning Regulations for the Unincorporated Territory of Douglas County, Kansas ("Zoning Regulations") govern supplementary uses, conditional uses, and temporary uses.

12.     Section 19-1.02 of the Zoning Regulations provides that an application for a conditional use must be filed with the Planning Commission, which will hold a public hearing and: shall review such plans and statements and shall, after a careful study thereof, and the effect that such buildings, structures, or uses will have upon the surrounding territory, submit a recommendation with findings of fact to the Board of Commissioners within thirty (30) days following said hearing, which shall include, but not be limited to, the following criteria:

    a.      Zoning and Uses of Properties Nearby;

    b.      Character of the Area;

    c.      Suitability of Subject Property for the Uses to Which It has been Restricted;

    d.      Length of Time Subject Property has Remained Vacant as Zoned;

    e.      Extent to Which Removal of Restrictions will detrimentally affect Nearby Property;

    f.      Relative Gain to the Public Health, Safety, and Welfare by the Destruction of the Value of Petitioner's Property as Compared to the Hardship Imposed upon the Individual Landowners;

    g.      Conformance with the Comprehensive Plan; and

    h.      Professional Staff Recommendation.

13.     Section 19.02 of the Zoning Regulations further provides that, following receipt of the Planning Commission's recommendation and Findings of Fact, the Board of Commissioners may, within the specifications herein provided, permit such buildings, structures, or uses, with or without conditions, provided that the public health, safety, morals, and general welfare will not be

9

adversely affected, that ample off-street parking facilities will be provided, and that necessary safeguards will be provided for the protection of surrounding property, persons, and neighborhood valued.

14.     Under Section 19-4(31) of the Zoning Regulations, a telecommunications tower is a conditional use that may be approved by the Board of Commissioners.

15.     Section 19-4(31)(b) of the Zoning Regulations require an applicant seeking a conditional use permit to construct a telecommunications tower to submit a development plan, which must include the following:

(1)     The applicant shall provide written authorization from the property owner of the proposed tower site.

(2)     An application for a tower shall include the submission of a site plan drawn to scale showing the property boundaries, tower, guy wire anchors and other apparatus, existing and proposed structures, proposed transmission buildings and/or other accessory uses, access road(s) location, access road surface material, parking area, fences, location and content of warning sign, exterior lighting specifications, a landscaping plan, land elevation contours, and existing land uses surrounding the site. If any accessory building is proposed, details of the building including elevations and proposed use of the building is required to be submitted with the application.

(3)     An application for tower approval shall include a report or written information which describes the tower height and design including a cross-section of the structure; engineering specifications detailing construction of tower, base and guy wire anchorage; the proposed painting and lighting schemes; and describes that tower's capacity, including the number and type of antennas that it can accommodate.

(4)     In addition to notifying property owners within 1,000 [feet] of the communication tower request per Article 24, all owners of record of unincorporated property located within a one (1) mile radius of the proposed tower request must also be notified with written notice by the applicant.

16.     Section 19-4(31)(c)(1) of the Zoning Regulations provides that: "An effort in good faith must be made to locate new antenna on existing towers, or other structures. A request for a new

10

tower must be accompanied by evidence that application was made to locate on existing towers, with no success."

17.   Under Section 19-4(31)(c)(2) of the Zoning Regulations, an application for a new telecommunications tower shall not be approved unless the applicant can document that the telecommunications equipment planned for the proposed tower cannot be accommodated on an existing or approved tower due to one or more of the following reasons:

    a.    The planned equipment would exceed the structural capacity of existing and approved towers, considering existing and planned use of those towers, and existing and approved towers cannot be reinforced to accommodate the planned or equivalent equipment at a reasonable cost.

    b.    The planned equipment would cause RF interference with other existing or planned equipment for these towers, and the interference cannot be prevented at a reasonable cost.

    c.    Existing or approved towers do not have space on which planned equipment can be placed so it can function effectively and reasonable in parity with other similar equipment in place or approved.

    d.    Other reasons that make it impracticable to place the equipment planned by the applicant on existing and approved towers.

18.   Section 19-4(31)(c)(3) provides that all towers "shall be designed to accommodate at least three two-way antennas for every 150 feet of tower height, or at least one two-way antenna and one microwave facility for every 150 feet of tower height."

19.   Section 19-4(31)(d) of the Zoning Regulations sets forth development standards ("Development Standards"), the first of which requires that the location of a ground mounted tower "must be . . . setback at least equal to the height of the tower to the nearest property line measured from the center of the tower."

11

20.     The Development Standards further require that the height of at tower "shall meet the setback requirements as stated in this chapter" and require that all towers "should be located in areas zoned commercial, industrial, or agricultural, except that towers may be permitted in areas zoned residential if it can be demonstrated that all reasonable efforts were made to locate the proposed tower in non-residentially zoned areas."

21.     Also, the Development Standards of the Zoning Regulations require that: All towers and accessory facilities shall be sited to have the least practical adverse visual effect on the environment. Towers shall not be lighted except to assure human safety as required by the Federal Aviation Administration (FAA). Towers should be a galvanized finish or painted gray or light blue unless other standards are required by the FAA. In all cases, mono pole towers shall be preferable to guyed towers or free standing structures. Towers should be designed and sited so as to avoid, whenever possible, application of FAA lighting and painting requirements.

**D.     The Planning Department's Consideration of CUP-03-05-07**

22.     CUP-03-05-07 was submitted to the Planning Department on or about February 21, 2007, and the Planning Department recommended its approval.

**E.     The April 23 Staff Report**

23.     On or about April 23, 2007, the staff (the "Planning Staff") of the Planning Commission prepared a Planning Commission Report (the "April 23 Staff Report") addressing the Proposed Tower, in which Planning Staff recommended approval of CUP-03-05-07, subject to four conditions.

**F.     Factors Considered by Planning Staff in the April 23 Staff Report**

24.     In the April 23 Staff Report, Planning Staff considered "zoning and uses of property nearby," and noted: "Surrounding area includes both rural residential and agricultural activities."

25.     Planning Staff further noted, regarding "surrounding zoning and land use": "A (Agricultural) District in all directions. Existing rural residential and agricultural activities and uses."

26.     In the April 23 Staff Report, Planning Staff set forth its finding regarding "zoning and uses of property nearby" as follows: "The subject property is zoned for agricultural uses. It is developed with an existing residence located approximately 500 feet west of the existing Highway right-of-way. The proposed tower is approximately 330 feet west of the existing Highway right-of-way. The subject property abuts Highway 59 along the east property line. An existing residential driveway provides access to the house and the proposed cell tower site. Detailed plans are not available from the County Public Works Department at this time, however preliminary highway designs do not indicate that the subject property will be affected or reduced by the proposed

13

highway project (scheduled 2009-2011). The new right-of-way line is estimated to be located several hundred feet to the east of the existing center line of Highway 59. Surrounding uses include existing rural residential homes along the Highway frontage as well as existing [remainder of section blank]."

27.     The April 23 Staff Report contains the following finding regarding "character of the area": "The character of the area includes rural residential homes and agricultural fields and activities. The subject property is located south of the Highway 56/59 intersection known as Baldwin Junction."

28.     In the April 23 Staff Report, Planning Staff set forth the following finding regarding "suitability of subject property for the uses to which it has been restricted": "The current zoning of the subject property will not be altered by the proposed request. The subject property is zoned A (Agricultural) and the existing and proposed uses [are] consistent with the recommended land use of the County Zoning Regulations."

29.     The April 23 Staff Report contains the following Planning Staff finding regarding "length of time subject property has remained vacant as zoned": "The subject property is developed with an existing home on 59.4 acres. The property has been zoned for agricultural purposes since 1966."

30.     The April 23 Staff Report contains the following Planning Staff finding regarding "extent to which removal of restrictions will detrimentally affect nearby property":

> The perception of the tower by residents of the area may be that it will negatively impact the visual aesthetics of the application. There is no county zoning code provision to address aesthetic appearance of a communication tower. The code does address "visual impact on the environment" as it relates to lighting (19-4 (31)(d)(6). The presence of a tower does not affect the physical health, safety or welfare of residents in the area.

> Approval of a Conditional Use Permit does not amend the base zoning district requirement and land use limitations that exist for the subject property. Detrimental effects are related to

aesthetic concerns as expressed by residents of the area. Placement of the tower in relationship to the existing private air strip does require additional consideration as noted in the review with regard to lighting and marking (painting) of the proposed tower.

31.     In the April 23 Staff Report, Planning Staff made the following finding regarding "relative gain to the public health, safety and welfare by the destruction of the value of the petitioner's property as compared to the hardship imposed upon the individual landowners": "There are no apparent physical detriments to the public health, safety, and welfare by the proposed request. Impacts to the area are one of an aesthetic nature as noted by comments received by staff during the review period from property owners in the area."

32.     Planning Staff made the following finding regarding "conformance with the comprehensive plan" in the April 23 Staff Report: "Horizon 2020 does not directly address the issue of condition[al] uses. The plan provides basic guidance regarding major infrastructure improvements and urges that such uses be carefully planned and provided. The provision of such services should be focused in existing service areas to address growth. Additionally, placement and visual appearance are a key consideration in creating compatibility. The plan notes that extension of electric and hard phone service connections to the proposed tower site will be underground."

33.     In the April 23 Staff Report, Planning Staff addressed the code requirement that an applicant make a "good faith effort," that an applicant provide "evidence that application was made to locate on existing towers with no success," and that a request for a new telecommunications tower "shall not be approved unless the applicant can document that the telecommunications equipment planned for the proposed tower cannot be accommodated on an existing or approved tower . . ." (collectively, the "Co-Location Requirements").

15

34.     In addressing the Co-Location Requirements, Planning Staff noted: "The justification includes a map provided by Planning Staff showing the location of existing towers in the surrounding area. These existing towers (one of which already supports the applicant's equipment) are located at N 500 road east of Highway 59. Another tower is located south of Highway 56 and within the City Limits of Baldwin. Non-residential buildings in the area are single story and thus do not provide sufficient height for co-location considerations. There are no existing communication towers or structures in the immediate vicinity to accommodate co-location options as documented in the applicant's submittal packet and confirmed by physical review of the immediate vicinity in the area.  The target area is the Highway 56/59 corridor between Overbrook and the City of Baldwin and between Ottawa and Lawrence. Typical development along this corridor includes rural residential uses and agricultural fields. Section 19-4(31)(C)(2)(a-d) establishes the reasons for consideration of a new tower that require the applicant to demonstrate the following:

- planned equipment would exceed the structural capacity of existing and approved towers,

- planned equipment would cause RF interference with other existing or planned equipment for these towers,

- existing or approved towers do not have space on which planned equipment can be placed so it can function, and

- other reasons that make it impracticable to place the equipment planned by the applicant on existing and approved towers.

There are no existing towers or planned improvements by the public sector nor are there any pending applications by other providers in this area that would serve as an opportunity for co-location. This statement is supported by the lack of applications made to either the Planning Office or Douglas County Zoning Office for a communication tower building permit or Conditional

16

Use Permit. The applicant's documents provide a statement as to the compliance of FCC regulations with regard to Section 19-4(31) of the County code. No cases of potential interference have been identified based on the applicant's justification report (Marion S. Crable, Network Real Estate). Any interference of this equipment with existing equipment in the broader area would be required to be adjusted by the applicant in accordance with FCC laws and regulations. There are no planned towers for the area."

35.     The Planning Staff determined that the Proposed Tower complies with the setbacks required by the Zoning Regulations.

36.     The Planning Staff also noted that the Masur Property is zoned agricultural and allows for the use of telecommunications towers subject to the approval of a conditional use permit, pursuant to Section 19-4(31)(d)(2).

37.     In concluding the April 23 Staff Report, Planning Staff explained: "The subject property is clearly zoned for the proposed use. The existing development of the subject property includes an agricultural activity that has similar characteristics to commercial activities. The subject property is located within an existing highway corridor. The applicant has provided documentation of a physical review of the area to identify co-location opportunities and the necessary justification reports required for submission per section 19-4(31). There are existing towers located to the north and east of the area, but are outside of the identified search ring. This documentation is consistent with County records regarding the location of existing communication towers and other towers (water) in the vicinity of the subject property. There is undeniably an existing residential presence surrounding the proposed tower location. The parent parcel is sufficiently large enough to accommodate the required setbacks given the proposed tower height. Staff recommends appropriate

17

landscaping around the tower base should be used to mitigate the view of the ground mounted equipment within the tower base enclosure. Landscaping should be provided to fully screen the enclosure from all sides."

## G.   Public Comment Regarding CUP-03-05-07 Noted in the April 23 Staff Report

38.      In a letter from Shelly Schmidt, 271 E. 1250 Road, Baldwin City, Kansas, referenced in the April 23 Staff Report, Ms. Schmidt voiced opposition to the Proposed Tower including, in part:

> I was mowing last night and began to imagine growing my garden, my 6 year old child practicing soccer, right next to an industrial looking site that is viewed by some as a health hazard. (I began studying and calling last night.) Would it be possible to get a guarantee that my son and my health well [sic] not be in danger?
>
>            *          *          *          *
>
> I have learned through real estate people, and my own research, that this tower will no doubt discourage anyone from buying our property as a family home.

39.      In a letter from John Brulez referenced in the April 23 Staff Report, Mr. Brulez voiced the following opposition to the Proposed Tower:

> I currently own 160 acres adjacent to the area requested and 310 acres across the road. This is beautiful ground that has much development potential as it currently sits. The construction of this tower will not only lower the value of my property it would also drastically reduce the potential of future development. The tower will be unsightly and create a potential hazard due to storms, wind, and lightning, all of which are very common in the area. The building of the tower also affect the tenants who currently lease the property, making it less desirable to them. And lastly, reduced potential for this ground would also have an ultimate effect [on] the county as a whole.

40.      On April 18, 2007, Donna and Bobby Saile submitted a letter to the Planning Commission voicing the following opposition to the Proposed Tower:

> [The Masur Property] is adjacent to our 80 acres located at 227 E. 1250 Road, Douglas County, Baldwin City, Kansas. We are protesting because we feel that this will devaluate the value of our property. It is our understanding that a tower will cause local TV reception interference. We believe that a tower should be placed in an area that is not residential.

**H.     The Planning Commission's Consideration of CUP-03-05-07**

41.     The Planning Commission considered CUP-03-05-07 in a meeting on April 23, 2007 ("April 23 Planning Commission Meeting") and recommended its approval based upon the statements and findings contained in the April 23 Staff Report.

42.     Curtis Holland, an attorney representing Verizon on CUP-03-05-07, explained at the April 23 Planning Commission Meeting that lighting is only required on a telecommunications tower if the tower extends beyond 200 feet.

43.     At the April 23 Planning Commission Meeting, the Planning Commission recommended approval of CUP-03-05-07 by a vote of 6-0-1, subject to the following conditions:

1.     Provision of a revised site plan to show the following:

    a.     Proposed landscape around the enclosure of the tower base per staff approval; and

    b.     Dimensions of the tower from the south property line;

2.     Provision of a revised site plan to include the following notes per Section 19-4(31)(c)(4&5)

    a.     "Any tower that is not in use for a period of three continuous years, or more, shall be removed by the owner at the owner's expense. Failure to remove the tower pursuant to non-use may result in removal and assessment of cost to the owner of the tower."

    b.     "A sign shall be posted on the exterior of the fence around the base of the tower nothing the name and telephone number of the tower owner and operator."

    c.     "The tower owner/operator shall submit a letter to the Planning Office by July 1st of each year listing the current users and types of antenna located on the approved tower (Reference CUP-03-05-07 in the letter)."

3.     Provision of a revised site plan to include a landscape plan compliant with Section 19A-4(1) that notes the size and type of landscape per staff.

19

4. Approval of a Floodplain Development Permit by the County Building and Zoning Department as applicable.

## I.    Public Comment at the April 23 Planning Commission Meeting

44. The minutes reflect that four citizens voiced opposition to CUP-03-05-07 at the April 23 Planning Commission Meeting. First, George Maxwell, owner of the private airstrip, "was concerned about the length of the Conditional Use Permit," but stated "[h]e would prefer the tower not have lighting at night for aesthetic reasons."

45. The second citizen to oppose the Proposed Tower at the April 23 Planning Commission Meeting was Marshall Hoyt. The minutes reflect that Mr. Hoyt "stated that if he had known when he bought the house that a cell tower would be put up and in view of his window he would not have purchased the home. He was opposed [to] the tower but if it was approved then he would prefer it not to have lights."

46   The third citizen to oppose the Proposed Tower at the April 23 Planning Commission Meeting was Jerry Smith. The minutes reflect that Mr. Smith "is opposed to the tower and would not like the tower to be lit because he would have to look at it out his kitchen window. He stated that towers already exist 4 ½ miles east, 5 miles to the north, and 4 miles west of Baldwin Junction there is another tower. He questioned why towers were not required to allow other providers equipment on them."

47. The fourth citizen to oppose CUP-03-05-07 at the April 23 Planning Commission Meeting was Donna Saile. The minutes reflect only that she "believed that the property value would depreciate."

**J.        The Submission of a Valid Protest Petition Against CUP-03-05-07**

48.        On or about May 2, 2007, property owners in the vicinity of the Masur Property submitted a valid protest petition.

**K.        Submission of the Trott Engineering Report**

49.        After the April 23 Planning Commission Meeting, but prior to the May 16 Board of Commissioners' Meeting, Verizon submitted a colored copy of an independent radio frequency propagation study ("Trott Report").

50.        The Trott Report explained:

Trott's review of the Verizon coverage maps included calculations using identical input data as provided by Verizon. The propagation software utilized by Trott is different from the software that Verizon used in their calculations. It is understood that Verizon developed their software based upon experience and drive testing. Trott uses propagation developed by EDX Engineering, Inc. . . . All available propagation software vary somewhat but generally use the same terrain data and are close in the results. The results of the Trott calculations were presented in maps . . . showing the same predicted cellular signal levels as shown in the Verizon maps. These were areas representing reliable coverage in buildings (red), coverage within vehicles (yellow) and street coverage (green). Trott's analysis calculated the coverage expected with and without the proposed South Ottawa cell site.

*              *              *              *

The results of the review show that, indeed, the addition of the proposed South Ottawa cell site will enhance the cellular coverage along and near the Highways 56 and 59 South of the existing cell site in South Lawrence.

**K.        Defendant's Consideration of CUP-03-05-07**

51.        On May 16, 2007 ("May 16 Meeting"), Defendant considered and voted upon CUP-03-05-07.

52.        Because the protest petition was valid, unanimous approval of CUP-03-05-07 by a vote of 3-0 by the Board of Commissioners was required.

53.        The May 16, 2007 County Commission Minutes (the "May 16 Meeting Minutes") reflect that the Staff Planner said  "Planning Staff recommends revising Condition No. 3 [of the

21

Planning Commission's recommendation of approval] to state that the ground-mounted equipment be screened with solid fencing on all four sides."

54.     The May 16 Meeting Minutes reflect that the Staff Planner later "clarified that Condition No. 3, as revised per Planning Staff recommendation, is written in response to stated neighbor concerns."

55.     According to the May 16 Meeting Minutes, Commissioner Johnson asked if Verizon "is agreeable with Condition No. 3, on the screening issue as recommended it be revised by Planning Staff," and Mr. Holland responded that Verizon "is willing to comply any way the Board requests."

56.     Commissioner Jones asked Mr. Holland to describe "the coverage problems in the area that would be addressed by this tower," and Mr. Holland referred to the propagation maps, with an exchange, as reflected in the post-lawsuit transcript, regarding the propagation map showing existing coverage, in pertinent part, as follows:

> Mr. Holland: [T]his is what we call a radio frequency propagation map. It is . . . produced by a computer software, models the existing coverage in the area of southern Douglas County . . . along 59 Highway . . .. It's this black line right here . . . 56 Highway just for your reference is located right here and the . . . reddish color that's there represents an existing facility . . . that Verizon operates from. And and I would tell you that . . . the one right here is in what we call our south Lawrence site. . . . it's a good three to four miles north of where we're proposing to put in a facility uh maybe slightly farther. This is the City of Baldwin, which has a nice . . . communication tower structure right in downtown Baldwin, and we have a facility showing up down there. . . .
>
>                    *              *              *              *
>
> Commissioner Jones: So red means high coverage and . . . . give us a sense of (unintelligible).
>
>                    *              *              *              *
>
> Mr. Holland:  Red is the best coverage you can have; white's the worst.
>
>                    *              *              *              *
>
> Mr. Holland: Red would be . . . significant in building coverage and . . . you can't really see it the lighter green, the yellow area is the second best coverage. . .[Y]ou can use your phone in your vehicle, . . . probably even in your house. . . .[W]here the material there is a . . . a difference in a commercial structure with brick and mortar and steel and . . . the ability to penetrate those structures versus a traditional wood . . . material for houses and . . . then the

darker green . . . is . . . it's still able to use in vehicle . . ..It's . . . not extremely reliable, but it's . . . serviceable from our stand point. White is no good. . . .but in this area of southern Douglas which is right here and this is the county line by the way . . . right here . . . Franklin to the south . . .. So that's our existing coverage. And what we're attempting to do . . . is provide our coverage in this particular area and get it down to the county line with our 850 system and then our 1900 system . . . also would carry forward. . . It's not the quality that Verizon needs in that area. There is a lot of traffic along 59 Highway going north and south every day.

*         *         *         *

Commissioner Johnson: So . . . will this tower create a red blob?

*         *         *         *

Mr. Holland: It would extend the red blob.

*         *         *         *

Mr. Holland: [I]t does certainly enlarge the red footprint . . . to a point that's acceptable to Verizon but more importantly allows us to provide good reliable coverage along the highway all the way down to Douglas County.

*         *         *         *

Commissioner Johnson: It virtually eliminates the white, doesn't it?  Yes it does.

*         *         *         *

Commissioner Jones: Going back to the white for a moment, so you're saying you do not have coverage at all in that area?

*         *         *         *

Mr. Holland: [In the] industry it means no coverage. It's no coverage.

*         *         *         *

Mr. Holland: But it's not good coverage and that's not to say that if you were standing in a [white] area, hey my phone worked. Well it might work on a particular day depending on . . .which way the wind's blowing for example I mean. But it's not good coverage.

57.    As reflected in the May 16 Meeting Minutes, Commissioner Jones asked Mr. Holland if Verizon "has information related to dropped calls," and Mr. Holland responded "that Verizon does not have that data available, but it would not be pursuing this option if it did not feel it needs a tower in this area."

58.    The May 16 Meeting Minutes reflect that Commissioner McElhaney asked "what the distance of the site is to the closest existing tower," and Mr. Holland stated "to the north probably about four miles."

23

59.     Commissioner Jones then asked the Staff Planner if "there are other providers who have . . . expressed concern about coverage in this area or have expressed that they have adequate coverage in this area."

60.     The May 16 Meeting Minutes indicate the Staff Planner responded that "she is not aware of concerns of any other providers in this area" and that the "communication Staff has had with various providers has primarily expressed interest in the urban area [and] Verizon has been active in providing coverage for the rural area."

61.     Commissioner Jones then asked "so we don't know whether they do or don't have adequate coverage in their mind in that area?" and the Staff Planner responded she "can't confirm that."

62.     Commissioner Jones then asked: "Are there any other elevated structures out there? For instance, water or anything like that?," and the Staff Planner responded: "The map that you have up there does identify water towers. These [sic] just not a lot of tall structures. If we see building structure I think many times those buildings are either not big enough or they're not structurally manageable to try to co-locate on them."

63.     Commissioner Jones then asked where the closest water tower is, and Commissioner Johnson advised him that it would be at least five miles north.

64.     Commissioner Jones then asked: "the tower your [sic] proposing.  It's height, what if you don't want it be, what if it doesn't have to be red there, but simply green? How, how short could that tower be and still provide, say, unbroken cell phone usage as you're driving down 59 Highway?" In response to this question, the following exchange ensued:

> Mr. Holland: Well I as I mentioned earlier, this is the lowest level we could get to and still provide that reliable coverage.

24

Commissioner Jones: And by reliable I mean just cell phone in cars.

65.     Commissioner McElhaney then asked the Staff Planner to explain "why there are two different maps."

66.     The May 16 Meeting Minutes reflect that the Staff Planner stated "there are two sets of propagation maps, one was prepared by Verizon as part of the applicant packet and is part of the justification booklet. An independent consultant prepared the other set of maps. There is a difference between the sets because the model used to generate the maps was different. The same thing could be said for a flood plain, and how you model that flood plain can produce a different boundary."

67.     Commissioner McElhaney indicated that because "they are modeling the proposed coverage areas in a different way [he] was just trying to figure out which model . . . was correct in the applicant's request."

68.     The Staff Planner responded: "Again, I think that there's probably in the engineering fields some calculation or margin of error, whatever that is, based on the modeling that you're using. I think both reports support the statement that Verizon makes that their coverage is not what they want it to be."

69.     Commissioner Johnson then asked, "so the point is you use two models and come to the same conclusion," and the Staff Planner responded, "[g]enerally, the same conclusion."

70.     Commissioner Johnson asked if they would like to hear from Mr. Trott, a professional engineer with Trott Communications Group, in response to which the following exchange occurred:

> Commissioner Jones:  I don't know. You know I'm really struggling with this issue of what is it that you get? And . . . since our last discussion and getting ready tonight, I've been doing a lot of reading and I think at a minimum the County owes you, owes I don't know, I don't know, I don't know that we owe you red across the entire County.

*          *          *          *

25

Commissioner Jones: And I don't know that that's a requirement of anybody. I think the only thing that we maybe owe is that somebody is providing coverage in all and which some people can get cell phone coverage. And so I'm wondering what's the minimum that you can do to get dark green in all those white areas? And that and that that's my question.

*          *          *          *

Mr. Holland: Right. And I . . . understand. . . . I don't disagree. We aren't entitled to red everywhere in the County. And certainly, it would cost us more money then it would probably be worth. . . . But we try to as efficiently as we possibl[y] can [to] cover our areas and really . . . live up to our responsibilities, our license requirements. The FCC rules impose on us an obligation to cover these areas. And so that's what we're trying to do is to . . . live up to those obligations. And it really it's going to enhance the coverage in this area of southern Douglas County. . . .

*          *          *          *

Commissioner Jones: Let me be candid, my concern isn't about Verizon. My concern is about the citizens of Douglas County. And I believe that they have the right to have coverage. Now part of the question is, if somebody's adequately, is somebody providing adequate coverage in that area? If nobody is providing adequate coverage than I think you have a more compelling case in terms of the demand. But if somebody else is providing . . . adequate coverage, I think the need of the citizens is met. And that may mean if they have to go to a different plan than they want to. But . . . I think from a legal standpoint, I think the need of the citizens is met. That's part of the reason I'm asking this question.

71.     To further help Defendant understand the propagation maps, Daniel Fagan explained

the coverage levels with the following analogy:

[W]hen you are looking at the levels of power, . . . it's like standing under a streetlight and reading a book. And the further you walk away to that light green area, the more you're st[r]aining to read the book. And when you get to the dark green area, you can't really make out the text but you can see it. Then of course the white area is you can't read the book at all. Meaning the book is the information, the data, voice quality and it it puts a strain on your devi[c]e. It puts a strain . . on coverage, so basically, that's what our design is. This is a prediction tool and their prediction can also tell us where dropped calls are most likely gonna happen.

72.     Raymond Trott then explained:

We . . . have a model that we use and it's somewhat different th[a]n Verizon's. But . . . the end result usually is pretty much the same. There are some minor differences in terrain and in . . . land features, the trees, building densities. These all enter into the calculations for all propagation of radio signals. And . . I was . . . contacted . . . to do an independent review of Verizon's coverage maps. Which I did and I think you have a copy of the report. Again, it's slightly different than what . . . Verizon shows, but . . . basically it does say that there is

26

coverage problems or will be coverage problems along Highway 56 without that site. And . . . there'll be several dropped calls I suspect.

73.    Commissioner Johnson then asked Mr. Trott: "What have we heard so far this evening that is not accurate?," and Mr. Trott responded: "Well you know there are some general terms that are used but basically, I think it's pretty accurate. . . maybe not right on but it certainly fits the . . . requirements and so forth."

74.    When the meeting was opened for public comment, the minutes reflect that three citizens voiced opposition to the Proposed Tower; first, Shelly Schmidt (who previously voiced opposition to the Proposed Tower) stated:

> [S]he has had Verizon for 15 years, with five lines that always work. She would have changed providers if she were not satisfied. She stated she is opposed to the tower and is concerned it will affect her property value and make it difficult for her to sell her property.

75.    Second, Marshall Hoyt (who previously voiced opposition to the Proposed Tower), stated:

> [L]andlines are not obsolete. He is opposed to the tower because its presence ruins the rural landscape. He stated he has used 911 and life flight and it works well. He doesn't appreciate using a fear factor to promote the tower. His cell coverage in the area is outstanding. He has a neighbor who lives 400 yards away who uses Verizon and has outstanding coverage. The tower would be an eyesore.

76.    Third, Donna Saile (who previously voiced opposition to the Proposed Tower), stated that she believes the tower will affect property values – houses are not built around towers. She questions the need for another tower when there are already three in the area.

**L.    The Denial of CUP-03-05-07**

77.    After closing public comment, the May 16 Meeting Minutes reflect that Commissioner Johnson stated:

27

he was in favor of the tower and voted for the last application submitted by the applicant because he felt the applicant met the code requirements. He said this is exactly the same situation as the applicant's last tower application, with a different location and a different set of faces. Johnson stated he believes that the applicant has met all the requirements for the placement of the tower conditions and he does not see any basis for denial. He understands the arguments from the surrounding property owners, but stated if we are going to have regulations and create standards, and hold people to these standards, then when the regulations are met, we are obligated to support them.

78.     The May 16 Meeting Minutes reflect that Commissioner McElhaney then stated:

it needs to be noted it was asked of the applicant at the prior Board meeting that if a revised location was brought forward, various criteria had to be met by this bench and further studies had to be done. The applicant has made great strides with the requests from this Commission. McElhaney noted that the applicant has twice been approved by the Planning Commission and twice Staff has recommended approval to the Commission. He feels the Board can approve on a 10-year CUP with a 5-year review with conditions the same as has been forwarded to the Board, but with an amendment to Condition No. 3 discussed earlier. He will vote for approval based on new information submitted with this application.

79.     The May 16 Meeting Minutes reflect that Commissioner Jones stated:

he wants to make a correction as reflected in the minutes. One of the Planning Commissioners asked Staff why the Board did not vote for the prior application and Staff apparently answered that there are those who are opposed to it. Jones states a much more accurate interpretation is in the minutes where we talk about co-location possibilities. Jones said he thinks we need to have an adequate number of cell towers to provide basic services, but doesn't really consider internet and other things basic services. He also stated if the Board is going to set a standard that everybody should have perfectly accessible connections to support their computers and other things, he thinks we're talking about many, many more towers than we've ever anticipated. We'd need to have red basically across the entire County. Maybe we're not there yet, but that's a lot bigger bite than he feels comfortable taking. He noted specifically in comparing the two propagation maps, the one provided by the client and then the one provided by Mr. Trott, that there is a significant difference. If you look at them side by side, you will see that the coverage on the Trott map appears to be, especially in terms of the yellow, the second tier coverage, a much broader footprint th[a]n what is indicated in the applicant's map. And there are very few areas of white on the Trott coverage map within the footprint that has been sited by the applicant. He believes the Trott propagation map indicates that there is adequate coverage. He doesn't agree with the point that if an applicant meets whatever the literal requirements are then that means it has the right to build a tower. If that was the case, then we'd never have public hearings and the public's opinion wouldn't matter – there would be no need for a CUP, it would be automatic. The fact of the matter is there's always two sides to the coin, there's always the need to balance the interests of the community with the interest of Verizon. And in this instance, he

does think there is clearly some adverse impact, in terms of at least the aesthetics. His goal has always and consistently been to have the fewest number of towers to achieve adequate coverage. He finds it very frustrating when Verizon or any other company steps forward and say they can't possibly coordinate the location of towers in that fashion, and can't do it in an advance sort of setting where we would sit down with a map and draw the minimum number of towers to provide adequate coverage and then go from that basic plan, as opposed to having a company come in and say, "We want to build a tower and we're pretty sure everyone else is going to jump on." Maybe they are and maybe they aren't. But that's not really planning and doesn't achieve the goal of having the fewest number of towers to provide adequate coverage. He stated he is going to vote against the application based on the statements above. The other map (the Trott Report) suggests coverage is not as bad as the applicant's map seems to indicate. Also, he thinks a tower in this location is inconsistent and incompatible with the other uses in the area. He is persuaded that they've got yellow, and they want red, and he is not convinced that red in this area is what they are entitled or what society owes to them. Jones stated the industry keeps coming to the County and saying, "You have to give us this." He suggested the providers need to come in as a group and tell the County what they need and what brings the maximum amount of coverage with the least amount of towers, and then he would agree. But for each company to come to advocate its own position is creating a scenario that is adverse to the public.

80.     The post-lawsuit transcript reflects the following exchange then occurred between

Commissioner Johnson and Commissioner Jones:

Commissioner Johnson: Well, but the third party . . . expert said there [are] deficiencies and . . . I think I understood the man to say supported the request of Verizon. Perhaps I didn't.

*          *          *          *

Commissioner Jones: Nuh uh. He said that there would be a few dropped phone calls.

*          *          *          *

Commissioner Johnson: I don't think he said a few. I think he said there would be dropped calls.

*          *          *          *

Commissioner Jones: I listened very, very carefully. That was the word that was said.

81.     Prior to voting, Commissioner Jones told Mr. Holland: "If you come back with

commitments from other cell companies to go on this tower, then I could support it. And I'll just

leave it at that."

82.     The Commissioners of Defendant voted 2-1 to approve CUP-03-05-07, but because

a vote of 3-0 was required, Defendant denied, or failed to approve, CUP-03-05-07.

83.     Commissioner Jones was the lone dissenting vote.

84.     The records produced by Defendant contain a letter dated May 21, 2007 from the Staff Planner and addressed to Mr. Holland advising Mr. Holland that "the application failed to receive the minimum required votes for approval ("May 21 Correspondence")."

85.     On or about June 28, 2007, the Staff Planner sent Mr. Holland further correspondence ("June 28 Correspondence") advising of the denial of, or failure to approve, CUP-03-05-07.  The correspondence stated that "Commission[er] Jones stated reasons for not supporting the motion (refer to minutes) are summarized as follows:

1.      The Board of Commissioners is not required to grant a Conditional Use Permit for each and every application for a communications tower. Verizon may desire a communications tower at the proposed site, but it is not necessarily entitled to have "red" coverage. In considering applications for communications towers, the Board of Commissioners is required to consider the public health, safety, morals and general welfare of the community. The County Zoning Regulations require towers to be sited to have the least practical adverse visual affect on the environment. Therefore, the Board of Commissioners must consider the need for a new tower and weigh it against the adverse visual affects on the environment and the interests of the community. Verizon did not establish a compelling need for the communications tower and the Board of Commissioners is not required to approve the Conditional Use Permit.

2.      No evidence was provided that Verizon or any other provider has a significant gap in coverage in the area of the proposed tower. Ve[r]i[z]on's propagation study shows it has mostly "yellow" and "green" coverage in the subject area. The propagation study of Trott Communications shows that Verizon has even better coverage (more "yellow," less "green," and very few areas of "white" coverage) than the Verizon propagation study. These studies indicate that basic wireless phone service is already available in the area of the proposed tower. This indication is supported by the lay testimony of a witness living in the area of the proposed tower who appeared at the hearing and stated that she has Verizon service with multiple lines and has not had trouble with service.

3.      No evidence was provided as to the number of dropped calls in the coverage area of the proposed tower. Verizon representatives admitted that Verizon has no data on dropped calls. Mr. Trott stated that he "suspected" several dropped calls would arise, but did not quantify this statement.

4.      Verizon has not satisfied the requirement that all co-location possibilities be exhausted in a documented fashion because other wireless service providers apparently have adequate coverage in the area.

5.      As a result of the above, the benefits of the proposed tower do not offset the detriments.

86.      In response to this Court's Order dated February 1, 2008, Defendant submitted a written decision describing the reasons for denying Verizon's application ("Written Denial"). That decision is filed of record as Docket # 24 in this case and contains the separate reasoning of Commission Jones for his position.

## Analysis

### A.      The Federal Telecommunications Act of 1996 ("TCA")

Congress enacted the TCA to promote competition and higher quality in telecommunications services and to encourage the rapid deployment of new telecommunications technologies.[15] Congress intended to promote a national cellular network and to secure lower prices and better

---

[15]*City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115 (2005).

service for consumers by opening all telecommunications markets to competition.[16] One of the ways in which the TCA accomplishes these goals is by reducing impediments imposed by local governments upon the installation of wireless communications facilities, such as antenna towers.[17] The TCA does not, however, abolish all local authority. It tries to balance its goals with the preservation of some local authority over land use. Put simply, the TCA "attempts to reconcile the interests of consumers and residents (many of whom are themselves cell phone users)."[18]

The TCA places six restrictions on the authority of local government to regulate the placement, construction, and modification of personal wireless service facilities.[19] Only one of these restrictions is at issue in this case: "Any decision by a local authority denying a request to place, construct, or modify a personal wireless facility must be supported by substantial evidence contained in a written record."[20] To that end, Verizon's claim in this lawsuit is that the Board of Commissioners' decision to deny its request for Conditional Use Permit is not supported by substantial evidence and thus violates the TCA.

**B.     The Substantial Evidence Standard**

Under 47 U.S.C. § 332(c)(7)(B)(iii), "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."

---

[16]*Second Generation Properties, L.P. v. Town of Pelham*, 313 F.3d 620, 631 (1st Cir. 2002).

[17]*Abrams*, 544 U.S. at 115.

[18]*Second Generation*, 313 F.3d at 631.

[19]*U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow*, 340 F.3d 1122, 1132-33 (10th Cir. 2003) ("*Broken Arrow*") (citing 47 U.S.C. § 332(c)(7)(B)).

[20]47 U.S.C. § 332(c)(7)(B)(iii).

It is well-settled that judicial review under the substantial evidence standard is quite narrow.[21]  That said, the Court's review, though highly deferential, is not a rubber stamp.[22] The court is limited to reviewing only the administrative record to see if it contains substantial evidence to support the Board of Commissioners' decision.[23] "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decision maker]. Substantial evidence requires more than a scintilla but less than a preponderance."[24]  Significantly, if the evidence can support one of two conclusions, the court must affirm the administrative agency's decision on summary judgment and not substitute its own judgment for that of the local board.[25]

It is very important to note at this juncture that Section 332(c)(7)(B)(iii)'s substantial evidence requirement "does not 'affect or encroach upon the substantive standards to be applied under established principles of state and local law.'"[26] Thus, the court looks to the requirements set forth in the local zoning ordinance to ascertain the substantive criteria to be applied.[27]  In other words, a governing body's decision to deny a request to construct a wireless telecommunications

---

[21]*Second Generation*, 313 F.3d at 627 (citing *Ready Mixed Concrete Co. v. N.L.R.B.*, 81 F.3d 1546, 1551 (10th Cir. 1996); *Am. Trucking Ass'ns, Inc. v. I.C.C.*, 703 F.2d 459, 462 (10th Cir. 1983) ("It is axiomatic that the scope of review by an appellate court of a Commission decision is a narrow one").

[22]*Id.* (citations omitted).

[23]*Second Generation,* 313 F.3d at 627-28.

[24]*Broken Arrow*, 340 F.3d at 1133 (quoting *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992).

[25]*Id.* (citing *Curtis, Inc. v. I.C.C.*, 662 F.2d 680, 685 (10th Cir. 1981)).

[26]*Broken Arrow*, 340 F.3d at 1133 (citing *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999)).

[27]*Id.* (citation omitted).

facility cannot be based on arbitrary criteria; the decision to deny must be grounded in procedural and substantive requirements specifically set forth in state and/or local law.

**C.      Procedural and Substantive Requirements in Local Zoning Ordinances**

Article 19 of the Zoning Regulations governs supplementary use regulations, conditional uses, and temporary uses. More specifically, section 19-1.02 of the Zoning Regulations provides that an application for a conditional use must be filed with the Planning Commission, which will hold a public hearing, review the plans, determine the effect that the use will have on the surrounding territory, and submit a recommendation with findings of fact to the Board of Commissioners that includes the following criteria:

a.      Zoning and Uses of Properties Nearby;

b.      Character of the Area;

c.      Suitability of Subject Property for the Uses to Which It has been Restricted;

d.      Length of Time Subject Property has Remained Vacant as Zoned;

e.      Extent to Which Removal of Restrictions will detrimentally affect Nearby Property;

f.      Relative Gain to the Public Health, Safety, and Welfare by the Destruction of the Value of Petitioner's Property as Compared to the Hardship Imposed upon the Individual Landowners;

g.      Conformance with the Comprehensive Plan; and

h.      Professional Staff Recommendation.

Following receipt of the Planning Commission's recommendation and Findings of Fact, the Board of Commissioners may permit such buildings, structures, or uses, with or without conditions, provided that the public health, safety, morals, and general welfare will not be adversely affected,

34

that ample off-street parking facilities will be provided, and that necessary safeguards will be provided for the protection of surrounding property, persons, and neighborhood valued.

Section 19-4(31)(b) of the Zoning Regulations requires an applicant seeking a conditional use permit for construction of a telecommunications tower to submit a development plan, which must include the following:

(1) The applicant shall provide written authorization from the property owner of the proposed tower site.

(2) An application for a tower shall include the submission of a site plan drawn to scale.

(3) An application for tower approval shall include a report or written information which describes the tower height and design.

(4) In addition to notifying property owners within 1,000 [feet] of the communication tower request per Article 24, all owners of record of unincorporated property located within a one (1) mile radius of the proposed tower request must also be notified with written notice by the applicant.

Section 19-4(31)(c)(1) of the Zoning Regulations provides that "[a]n effort in good faith must be made to locate new antenna on existing towers, or other structures. A request for a new tower must be accompanied by evidence that application was made to locate on existing towers, with no success." Under Section 19-4(31)(c)(2) of the Zoning Regulations, an application for a new telecommunications tower shall not be approved unless the applicant can document that the telecommunications equipment planned for the proposed tower cannot be accommodated on an existing or approved tower due to one or more of the following reasons:

a. The planned equipment would exceed the structural capacity of existing and approved towers, considering existing and planned use of those towers, and existing and approved towers cannot be reinforced to accommodate the planned or equivalent equipment at a reasonable cost.

b. The planned equipment would cause RF interference with other existing or planned equipment for these towers, and the interference cannot be prevented at a reasonable cost.

35

c.      Existing or approved towers do not have space on which planned equipment can be placed so it can function effectively and reasonable in parity with other similar equipment in place or approved.

d.      Other reasons that make it impracticable to place the equipment planned by the applicant on existing and approved towers.

Finally, the Development Standards of the Zoning Regulations require that all towers and accessory facilities shall be sited to have the least practical adverse visual effect on the environment.

## D.    The Board of County Commissioner's Reasons for Denying Verizon's Application

In a nutshell, the Written Denial provides two[28] reasons for the Board of Commissioners' decision to deny Verizon's request for a conditional use permit:

(1)     The need for the proposed communication tower (in terms of service coverage) is outweighed by the adverse impact on the welfare of the community; and

(2)     Verizon failed to satisfy the requirement that all co-location possibilities be exhausted.

As a preliminary matter, the Court finds that, as required by the TCA, both of these reasons are grounded in substantive and procedural requirements specifically set forth in local law. The first reason is grounded in section 19-1.02(f) of the Zoning Regulations, which provides for the following criteria to be examined when considering a request for conditional use permit: the relative gain to the public health, safety, and welfare by the destruction of the value of property as compared to the hardship imposed upon the individual landowners. The first reason is also grounded in section 19-4(31)(d)(6), which provides that all towers should be sited to have the least practical adverse visual

-----

[28]The second and third numbered statements in the Written Denial are examples of, and thus encompassed by, the first numbered statement. The fifth numbered statement is not a reason, but a summary of the first numbered statement.

36

impact on the environment.  The second reason is grounded in sections 19-4(31)(c)(1) and (2) of the

Zoning Regulations, which requires documentary evidence that a good faith effort was made to

locate a new antenna on existing towers or other structures.

Thus, the issue now presented is whether these two reasons are supported by substantial

evidence in the administrative record.

### (1)     Reason One: Need for the Proposed Communication Tower is Outweighed by the Adverse Impact on the Community

In reviewing Defendant's decision that need for the tower is outweighed by an adverse effect

on the community under the substantial evidence standard, it is important to note that the Court's

function is not to reweigh the evidence, but rather to assess whether the ultimate decision is

supported by substantial competent evidence in the record.  In other words, the Board's decision

must be affirmed even if , upon balancing the competing interests, the court would decide the matter

differently.[29]

### (a)     Evidence in the Record Regarding Current Level of Coverage

Determinations "concerning the quality of existing service must be based on substantial,

competent evidence and remain subject to judicial review."[30]  A "decision that is based on the

resolution of technical issues cannot be sustained under the substantial evidence standard where the

determination was made based not on testimony and evidence in the record but rather on the

---

[29]*Broken Arrow*, 340 F.3d at 1133 (quoting *Sandoval*, 967 F.2d at 382).

[30]*Cellular Tel. Co. v. Zoning Bd. of Adjustment of Ho-Ho-Kus*, 197 F.3d 64, 71 (3d Cir. 1999) (holding that the local zoning authority's finding that existing service is adequate is not supported by substantial evidence).

adjudicator's own independent findings on the technical issues."[31] An "adjudicator's unsubstantiated belief is insufficient" under the substantial evidence standard.[32]

Here, both Verizon's radio frequency propagation map showing current coverage levels and the Trott Report radio frequency propagation map showing current coverage levels demonstrate that the area the Proposed Tower seeks to serve along Highways 56 and 59, which consists of several miles of highway in Douglas County down to the Franklin County line, primarily has only in-vehicle and on-street coverage with spots of no coverage. That is, Verizon customers driving or living in those areas depicted as yellow (in-vehicle) on the maps can only use their wireless phones reliably in their cars or outside, those Verizon customers driving or living in those areas depicted as green (on-street) on the maps can only use their wireless phones reliably outside, and those Verizon customers driving or living in those area depicted as white (no coverage) on the maps will have no reliable service. In sum, it appears from the maps that anyone driving along either Highway 56 or Highway 59 down to or along the Franklin/Douglas County line will experience coverage problems as they travel from a yellow (in-vehicle) area to green (on-street) area to a white (no coverage) area.

Notwithstanding this evidence, Defendant concluded in its Written Denial that there are no coverage problems in the area at issue. In support of this conclusion, Defendant relies on

1.      the lay testimony of a witness living in the area of the Proposed Tower who appeared at the hearing and stated that she has Verizon service with multiple lines and has not had trouble with service;

2.      Verizon's failure to present evidence that

---

[31]*Primeco Personal Communications Ltd. P'ship v. City of Mequon,* 242 F. Supp.2d 567, 577- 78 (E.D. Wis. 2003) (rejecting city's argument that it was free to make a policy decision that sites providing a certain percentage of coverage were adequate), *aff'd* 352 F.2d 1147 (7th Cir. 2003).

[32]*Id.* at 578.

38

     a.      it has a compelling need for the Proposed Tower;

     b.      its customers are experiencing dropped calls in the area around the Proposed Tower;

     c.      there is a significant gap in service in the area around the Proposed Tower; and

     d.      other providers are not meeting the needs of users in the area around the Proposed Tower.

The Court finds that these two assertions are not such that a reasonable mind might accept as adequate to support a conclusion that Verizon has no coverage problems in the area around the Proposed Tower. The first assertion not only ignores the radio frequency reports, propagation maps and other evidence and testimony that Verizon submitted regarding its current coverage, but it also ignores the fact that Verizon presented evidence that it is not merely trying to improve service to its customers who live in the immediate vicinity of the tower (such as the woman who testified), but is trying to improve its coverage along Highways 56 and 59 and down to the Douglas County line.

The second assertion also ignores significant evidence to the contrary and imposes a burden upon Verizon to prove facts for which there is no requirement under state or local law. The Tenth Circuit has clearly enunciated that, in conducting substantial evidence reviews under the TCA, a court is to "look to the requirements set forth in the local zoning ordinance to ascertain the substantive criteria to be applied."[33]      To that end, the local zoning ordinances do not require a provider to submit statistical evidence of dropped calls in order to establish inadequate levels of service. Neither do the local zoning ordinances require a provider to demonstrate a compelling need for the Proposed Tower or a significant gap in coverage – either for itself or for other providers –

---

[33]*Broken Arrow,* 340 F.3d 1122, 1133 (10th Cir. 2003) (citing *Town of Amherst v. Omnipoint Communications Enters., Inc.*, 173 F.3d 9, 14 (1st Cir. 1999)).

to establish inadequate levels of service.  In fact, a "significant gap in coverage" is a legal concept under the TCA wholly distinct from the substantial evidence standard.

As noted above, the TCA places six restrictions on the authority of local government to regulate the placement, construction, and modification of personal wireless service facilities.[34]  As also noted above, one of these restrictions is at issue in this case: "[a]ny decision by a local authority denying a request to place, construct, or modify a personal wireless facility must be supported by substantial evidence contained in a written record."[35]  When a court is presented with a lack of substantial evidence claim, review of the local board's decision is deferential and limited to only the administrative record to determine if it contains substantial evidence to support the decision.[36]

Another restriction – which is not at issue in this case – forbids local authorities from making a decision that prohibits or have the effect of prohibiting the provision of personal wireless services.[37] Unlike a substantial evidence claim, an effective prohibition claim is reviewed *de novo* and may be based on newly proffered evidence.[38]  The determination of whether a denial violates the TCA's effective prohibition clause requires a determination as to whether there is a "significant gap" in coverage.[39]  This Court recently has held that a significant gap in service (and thus an

---

[34]*U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow*, 340 F.3d 1122, 1132-33 (10th Cir. 2003) ("*Broken Arrow*") (citing 47 U.S.C. § 332(c)(7)(B)).

[35]47 U.S.C. § 332(c)(7)(B)(iii).

[36]*Second Generation*, 313 F.3d at 627-28.

[37]47 U.S.C. § 332(c)(7)(B)(i)(II).

[38]Need citation

[39]Need citation ("Accordingly, the Court holds that a significant gap in service (and thus an effective prohibition of service) exists when a provider is prevented from filling a significant gap in its own service coverage.")

40

effective prohibition of service) exists when a provider is prevented from filling a significant gap in its own service coverage; whether other providers have a significant gap is immaterial to the determination.[40]

Here, the only claim asserted is that the underlying record does not contain substantial evidence to support Defendant's decision.  There is no effective prohibition claim; thus, there is no need to determine whether a significant gap in coverage exists for Verizon or for any other provider. There simply is nothing in the TCA, state law, or the Zoning Regulations that requires Verizon to establish that it – or any other provider – has a significant gap in coverage in the area of the Proposed Tower as a prerequisite to obtaining a conditional use permit for the construction of a new wireless tower.  Thus, a denial on this basis cannot be said to be supported by substantial evidence in the record.

Even if there was a requirement to show a significant gap in service, the Court finds a denial on this basis is not supported by substantial evidence.  Again, this Court recently has held that a significant gap in service exists when a provider is prevented from filling a significant gap *in its own service coverage*.  The record here includes both Verizon's radio frequency propagation map showing current coverage levels and the Trott Report radio frequency propagation map showing current coverage levels, which both demonstrate that the area the Proposed Tower seeks to serve along Highways 56 and 59 primarily has only in-vehicle and on-street coverage with spots of no coverage. That is, Verizon customers driving or living in those areas depicted as yellow (in-vehicle) on the maps can only use their wireless phones reliably in their cars or outside, those Verizon customers driving or living in those areas depicted as green (on-street) on the maps can only use

---

[40]*Id.*

their wireless phones reliably outside, and those Verizon customers driving or living in those area depicted as white (no coverage) on the maps will have no reliable service. In sum, it appears from the maps that anyone driving along either Highway 56 or Highway 59 down to or along the Franklin/Douglas County line will experience coverage problems as they travel from a yellow (in-vehicle) area to green (on-street) area to a white (no coverage) area.

Notwithstanding this evidence, Commissioner Jones stated his opinion at the Board of Commissioners' meeting that (1) he personally believed Verizon's current service coverage was reliable; (2) in comparing the Verizon Report and the Trott Report, the Trott propagation map indicates more yellow [in-vehicle] coverage than on the Verizon propagation map; and (3) the current coverage shown on the Trott propagation map provides, in his opinion, an adequate level of telecommunication service for Verizon.

A "decision that is based on the resolution of technical issues cannot be sustained under the substantial evidence standard where the determination was made based not on testimony and evidence in the record but rather on the adjudicator's own independent findings on the technical issues."[41] An "adjudicator's unsubstantiated belief is insufficient" under the substantial evidence standard.[42] Here, Commissioner Jones points to nothing in the record to support his assertions, other than his personal opinions about what "adequate coverage" means and his interpretation of the technical radio frequency propagation studies. Thus, the Court finds that Commissioner Jones's independent resolution of a technical issue is not evidence that a reasonable mind might accept as

---

[41]*Primeco,* 242 F. Supp.2d at 577- 78 (rejecting city's argument that it was free to make a policy decision that sites providing a certain percentage of coverage were adequate).

[42]*Id.* at 578.

adequate to support the conclusion. For these reasons, Commissioner Jones' conclusion does not constitute substantial evidence for purposes of the FTA.

Based on the discussion above, the Court finds the evidence in the administrative record is not such that a reasonable mind might accept as adequate to support a conclusion that Verizon has no coverage problems in the area around the Proposed Tower.

**(b)**     **Evidence in the Record Regarding Adverse Impact on the Community**

**(i)**     **Adverse Impact on the General Welfare of the Community if the Proposed Tower is Built**

The administrative record establishes that the Douglas County Planning Commission and its Staff considered the factors within the Zoning Regulations and concluded that "there are no apparent physical detriments to the public health, safety, and welfare by the proposed request" and that "the presence of a tower does not affect the physical health, safety or welfare of residents in the area." Notwithstanding these conclusions, the Board relied on the following evidence to find that there would be a detrimental effect on the health, safety and general welfare of the community if the Proposed Tower is built:

- One resident opposed the tower based on fears that it might create a health hazard;

- One resident complained that it might cause local television reception interference;

- One resident opposed the Proposed Tower based on his speculation that it will create a potential hazard during storms, wind, and lightning. The same resident opposed the Proposed Tower based on his opinion that the Proposed Tower will reduce the potential for future development of the land; and

- The three residents listed above opposed the Proposed Tower on the grounds that it will likely reduce their property values.

Notably, there is no evidence in the record regarding health hazards, local television reception interference, hazards due to weather conditions, reduction in future land development or reduction in property values as a result of building a wireless telecommunications tower. Without any factual support, the generalized and unsubstantiated concerns expressed by the residents referenced above do not constitute substantial evidence to support any finding by the Board

regarding an adverse impact on the safety and welfare of the community.[43]  This is especially true given that, with regard to hazards due to weather conditions, Verizon presented evidence that the Proposed Tower will not collapse, even under extreme storm and wind conditions.  And, with respect to property values, Verizon presented several studies explaining that wireless telecommunications towers have not been linked to a reduction in property values. Simply put, the opinions expressed by the three residents are not supported by any facts whatsoever and thus their stated concerns do not constitute substantial evidence to support Defendant's decision.

### (ii)    Adverse Visual Effect on the Environment if the Tower is Built

Planning Staff noted in the April 23 Staff Report that "[i]mpacts to the area are one of an aesthetic nature as noted by comments received by staff during the review period from property owners in the area." Based on this notation, the Planning Commission recommended approval of

---

[43]*Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 496 (2d Cir. 1999) (holding substantial evidence did not support denial based on property values where residents expressed general concerns that presence of nearby cell sites would decrease home values and real estate broker submitted unsupported affidavit simply stating that presence of cell sites would depress real estate values); *USOC of Greater Iowa, Inc. v. City of Bellevue*, 279 F. Supp.2d 1080, 1086-87 (D. Neb. 2003) (holding that substantial evidence did not support denial based on property values where only contrary evidence in record was generalized property concerns by eight laypersons); *Primeco Pers. Communications Ltd. P'ship v. City of Mequon*, 242 F. Supp.2d 567, 579 (E.D. Wis. 2003) (where witness stated he "thought that the facility might involve health risks but gave no reason for this opinion and, in any case, under the [TCA], the possibility of such risks cannot be a basis for denying a permit"); *SBA Communications, Inc. v. Zoning Comm'n of the Town of Franklin,* 164 F. Supp.2d 280, 293 (D. Conn. 2001) (stating substantial evidence did not support denial based on property values where only evidence contrary to applicant's expert testimony was a few generalized concerns about a potential decrease in property values); *SBA Communications, Inc. v. Zoning Comm'n of the Town of Brookfield*, 112 F. Supp.2d 233, 241 (D. Conn. 2000) (noting TCA prohibits denial of siting request based on fear of risk to health provided proposed tower complies with FCC standards for isotropic radio frequency emissions); *Sprint Spectrum, L.P. v. Town of North Stonington*, 12 F. Supp.2d 247, 253-54 (D. Conn. 1998) (holding that substantial evidence did not support denial based on property values because a zoning authority cannot disregard the only evidence in the record on property values and the only contrary evidence in the record was mere speculation as to impact on property values).

CUP-03-05-07 with the condition of fencing and screening of the ground-based equipment to address concerns raised by neighbors, with which condition Verizon agreed to comply. Neither the Planning Staff nor the Planning Commission made any independent observations or findings regarding aesthetics.

While aesthetics can be a valid ground for local zoning decisions under Kansas law,[44] it can only be a permissible ground for denial of a permit under the TCA if it is supported by substantial evidence. Generalized concerns regarding aesthetics do not constitute sufficient evidence for purposes of the TCA.[45] Here, the only evidence in the record regarding aesthetics upon which

_____

[44]*See R.H. Gump Revocable Trust v. City of Wichita*, 35 Kan. App. 2d 501, 512, 131 P.3d 1268, 1276 (2006) (holding that city's denial of conditional use permit on aesthetic grounds was not unreasonable).

[45]*See U.S. Cellular Corp. v. Bd. of Adjustment of the City of Seminole*, 180 Fed. Appx. 791, 794 (10th Cir. 2006) (stating that mere generalized concerns regarding aesthetics are insufficient to create substantial evidence); *New Par v. City of Saginaw*, 301 F.3d 390, 398 (6th Cir. 2002) (finding substantial evidence did not support denial of application on basis of aesthetics where, at the Board meetings, aesthetic concerns mentioned only a few times and were never discussed); *Town of Oyster Bay*, 166 F.3d at 495-96 (generalized expression of concern with "aesthetics" cannot serve as substantial evidence); *Preferred Sites, LLC v. Troup County*, 296 F.3d 1210, 1219 (11th Cir. 2002) ("Mere generalized concerns regarding aesthetics, however, are insufficient to create substantial evidence justifying the denial of a permit" under the TCA); *see also Primeco*, 352 F.3d at 1150-51 (substantial evidence did not support denial on aesthetic grounds where only "evidence" regarding aesthetic considerations was testimony of three to four residents who said they did not like poles in general); *Omnipoint Communications, Inc. v. Village of Tarrytown Planning Bd.*, 302 F. Supp.2d 205, 222 (S.D. N.Y. 2004) (finding as a matter of law that unsubstantiated community objection to aesthetics is not sufficient evidence to support Board's denial); *USOC of Greater Iowa, Inc.*, 279 F. Supp.2d at 1086 (holding that where eight layperson residents spoke in opposition to the tower expressing generalized concerns about aesthetics and property values did not constitute substantial evidence under the TCA, explaining that "These 'NIMBY' (not in my backyard) concerns do not constitute substantial evidence."); *SBA Communications Inc.*, 164 F.Supp.2d at 291-92 (holding that substantial evidence did not support a denial on aesthetic grounds where "the Commission received anecdotal evidence concerning citizens' concerns over the aesthetic impact of the proposed monopole. The evidence in the record was merely a few generalized expressions of concern with the aesthetics of the monopole and speculation as to the visual nature of the proposed monopole of a few residents in the town."); *Sprint Spectrum, L.P. v. County of St. Charles*, No. 4:04CV1144

Defendant relies to deny Verizon's application is the testimony of (1) Shelly Schmidt regarding "an industrial looking site"; (2) John Brulez that the Proposed Tower will be "unsightly"; (3) Marshall Hoyt that he would not have purchased his house if he had known "that a cell tower would be put up and in view of his window", that "its presence ruins the rural landscape" and that "it would be an eyesore"; and (4) Jerry Smith that he "would not like the tower to be lit because he would have to look at it out his kitchen window"[46]

Other than their generic "not in my backyard" complaints regarding the Proposed Tower, none of the four citizens who voiced opposition to the Proposed Tower on aesthetics grounds provided any evidence of the tower's negative aesthetic impact. Such generalized "not in my backyard" opposition does not, as a matter of law, constitute substantial evidence on which to deny a proposed wireless telecommunications facility on aesthetics grounds under the TCA.[47] As such, the Court finds the Board of Commissioners' determination with regard to aesthetics are wholly unsupported by any evidence in the written record.

**(2)      Reason Two: Verizon Failed to Exhaust All Co-Location Possibilities**

As its second reason for denying the conditional use permit, the Board of Commissioners contends  that "Verizon has not satisfied the requirement that all co-location possibilities be exhausted in a documented fashion."  In support of this conclusion, the Board further contends that

---

RWS, 2005 WL 1661496, at *6 (E.D. Mo. July 6, 2005) (noting that "[a] 'not in my backyard' generalized objection does not constitute substantial evidence to support the denial of a tower permit");

[46]The Proposed Tower would not be lighted.

[47]*See* cases cited *supra* note 45.

47

other wireless service providers apparently have adequate coverage in the area.  The Court finds that neither of Defendant's contentions are supported by substantial evidence in the record.

### (a)      Evidence Regarding Coverage of Other Service Providers

First of all, and as noted earlier in this opinion, the fact that other wireless service providers may or may not have "adequate coverage" in the area is wholly irrelevant to a consideration of Verizon's application.  And, even if service coverage of other service providers was relevant to Verizon's application, there is no evidence in the record here regarding the level of service of any other provider in the area.  As such, there simply is no evidence from which the Board could determine that other providers had adequate coverage.

The record reflects that Commissioner Jones asked the Staff Planner whether other providers have "expressed concern about coverage in this area" or "expressed that they have adequate coverage in this area." The Staff Planner responded that Planning Staff's communications with other providers indicate that other providers "have primarily expressed interested in the urban area," while "Verizon has been active in providing coverage for the rural area."  Such a statement does not translate into evidence that other providers have adequate coverage in rural areas; rather, it only translates into a suggestion that other providers are focusing on urban markets while Verizon, in this case, is focusing on a rural market.

Commissioner Jones then asked the Staff Planner "so we don't know whether [other providers] do or don't have adequate coverage in their mind in that area?" and the Staff Planner responded that she "can't confirm that."  This statement by the Staff Planner reveals that there is no confirmation – that is, no evidence – that other providers have adequate coverage in the area.

48

Finally, even if there was evidence in the administrative record to demonstrate that existing cellular service was adequate, it is inappropriate to deny a conditional use permit for this reason. The FTA "does not permit state or local zoning authorities to reject an application to locate a personal wireless service facility based solely on the fact that 'existing cellular service . . . is all that is necessary and that no further competition from [the applicant] . . . will be permitted,'" as such authority would "frustrate[ ] the primary purpose of the [FTA] 'to increase competition in the telecommunications industry.'"[48]

### (b)    Evidence Regarding Exhaustion of Co-Location Possibilities

As a basis for denial, Defendant concludes Verizon did not satisfy the requirement that all co-location possibilities be exhausted in a documented fashion as required by the Zoning Regulations. Defendant's conclusion, however, is completely unsupported by the administrative record and, in fact, is overwhelmed by evidence that Verizon did, in fact, document its exhaustive attempts to co-locate on existing facilities.[49]

Section 19-4(31)(c)(1) of the Zoning Regulations requires that a good faith effort "must be made to locate new antenna on existing towers, or other structures," and a request for a new tower "must be accompanied by evidence that application was made to locate on existing towers, with no success." The Planning Staff, as noted in the April 23 Staff Report, determined that Verizon satisfied this requirement. Evidence shows that Verizon explained it first attempts to locate existing towers

---

[48]*See Nextel West Corp. v. Town of Edgewood*, 479 F.Supp.2d 1219, 1229 (D.N.M. 2006) (discussing the FTA's anti-discrimination prohibition).

[49]See *Sprint Spectrum, L.P. v. Bd. of County Comm'r of Jefferson County*, 59 F. Supp.2d 1101, 1105 (D. Colo. 1999) (finding evidence is not "substantial" for purposes of the TCA if it is overwhelmed by other evidence).

or other structures within the search ring on which to co-locate.  The record shows that its agent, SSC, viewed the area within the search ring identified by Verizon's radio frequency engineers and excluded from consideration approximately the west half of the search ring due to flood plain issues and a private landing strip. In the remaining areas of the search ring, SSC found no structures of a sufficient height or strength to meet the engineering requirements.

Record evidence also shows that Verizon submitted a justification map showing the location of two existing towers in the surrounding area (but outside of the search ring), and, as Planning Staff found, non-residential buildings in the area do not provide sufficient height for co-location considerations. Planning Staff found Verizon's documentation regarding existing towers to be "consistent with County records regarding the location of existing communication towers and other towers (water) in the vicinity of the subject property."  Planning Staff further found that there are "no existing communications towers or structures in the immediate vicinity to accommodate co-location options as documented in the applicant's submittal packet and confirmed by physical review of the immediate vicinity in the area."

At the May 16 Board of Commissioners' Meeting, Commissioner Jones asked if there were "any other elevated structures out there." The Staff Planner responded that the map does identify water towers.  Commissioner Johnson further responded to Commissioner Jones' inquiry by stating that the closest water tower is about five miles to the north (well outside the one-mile radius of the search ring). The closest existing tower is approximately four miles to the north of the Proposed Tower.

Despite the evidence submitted by Verizon and Planning Staff's confirmation of the same, the Board denied CUP-03-05-07 on the basis that "Verizon has not satisfied the requirement that all

50

co-location possibilities be exhausted in a documented fashion." Simply put, this finding is not supported by any evidence in the record and is overwhelmed by evidence in the record to the contrary.  Therefore, the finding does not constitute substantial evidence under the TCA.

### Remedy

Verizon seeks an injunction directing the Board of Commissioners to approve its application so as to remove any further obstacles to its construction of the proposed cell site. The Board of Commissioners asserts injunctive relief is inappropriate here as there is no evidence that it, as a local government, demonstrated it was willing to reach beyond its authority to avoid requirements of the TCA.[50]  Given Defendant's assertion, the Court finds it appropriate to consider whether the alternative remedy of remand for further consideration is proper in this case.[51]

The TCA directs that a district court shall decide suits on an expedited basis.[52]  Because of the extensive delay that has already occurred in this case, the Court finds that remand for further proceedings is not appropriate.[53]  Despite having the opportunity to do so, the Board fo Commissioners has failed to provide a decision supported by substantial evidence as required by the

---

[50]*Western PCS II Corp. v. Extraterritorial Zoning Auth.,* 957 F.Supp. 1230, 1239-40 (D.N.M. 1997) (holding injunctive relief is only available when local government demonstrates it is willing to reach beyond its authority to avoid requirements of the TCA).

[51]*See Cellular Telephone Co. v. Board of Adjustment of Borough of Paramus*, 37 F.Supp.2d 638, 651-52 (D.N.J. 1999) (citing *Virginia Metronet, Inc. v. Board of Supervisors of James City County*, 984 F.Supp. 966, 977 (E.D.Va. 1998); *AT&T Wireless PCS v. City Council of Virginia Beach*, 979 F.Supp. 416, 431 (E.D.Va. 1997)).

[52]47 U.S.C. § 332(c)(7)(B)(v).

[53]*See Paramus*, 37 F.Supp.2d at 652 (citing *Virginia Metronet*, 984 F.Supp. at 977; *AT&T Wireless PCS*, 979 F.Supp. at 431; *Illinois RSA No. 3, Inc. v. County of Peoria*, 963 F.Supp. 732, 747 (C.D. Ill. 1997); *Western PCS II Corp.*, 957 F.Supp. at 1239-40; *BellSouth Mobility, Inc. v. Gwinnett County*, 944 F.Supp. 923, 929 (N.D. Ga. 1996)).

TCA.[54] The Board of Commissioners was aware of the TCA and its requirements but failed to comply with them. Remand would serve only to further delay the resolution of this matter and frustrate the intent of the TCA. Accordingly, Verizon's request for an injunction directing the Board of Commissioners to grant the Application will be granted.

### Conclusion

The Court concludes that the Board of Commissioners' denial of Verizon's application for a conditional use permit to construct a wireless telecommunications facility violates the TCA because the denial was not supported by substantial evidence in the administrative record. Accordingly, it is hereby ordered that Verizon's Motion for Summary Judgment (doc. 12) is granted with respect to this issue.

It is further ordered that Verizon's Motion for Summary Judgment (doc. 12) on grounds that Defendant's denial fails to meet the "in writing" requirement of the TCA is moot.

It is further ordered that Defendant's Motion for Summary Judgment (doc. 16) is denied.

It is further ordered that Verizon's counsel shall meet and confer with counsel for the Board of Commissioners and shall submit a proposed final order granting the relief requested in Verizon's Complaint no later than March 21, 2008.

IT IS SO ORDERED.

Dated in Kansas City, Kansas on this 28th day of February, 2008.

s/ David J. Waxse
David J. Waxse
United States Magistrate Judge

cc:     All counsel and *pro se* parties

_____

[54]*See* 47 U.S.C. § 332(c)(7)(B)(iii).